Leslie VICARI, Plaintiff,

v.

YSLETA INDEPENDENT SCHOOL
DISTRICT and Dennis Miller,
Defendants.

No. EP–06–CA–131–FM.

United States District Court,
W.D. Texas,
El Paso Division.

Feb. 4, 2008.

Charles Mark Berry, Attorney at Law, El Paso, TX, for Plaintiff.

Rosemary M. Marin, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, PC, Katari Dawn Buck, Scott & Hulse, PC, for Defendants.

## MEMORANDUM OPINION AND ORDER:

*(1) SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' OBJECTIONS;*

*(2) DENYING DEFENDANTS' MOTION TO STRIKE;*

*—AND—*

*(3) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

FRANK MONTALVO, District Judge.

Before the Court is Defendant Ysleta Independent School District's ("YISD") and Defendant Dennis Miller's ("Miller") (collectively, "Defendants") "Motion for Summary Judgment" ("Motion") [Rec. No. 46], filed through counsel on March 12, 2007. After obtaining several enlargements of time, Plaintiff Leslie Vicari ("Vicari") filed her "Opposition to Defendant's [sic] Motion for Summary Judgment" ("Response") [Rec. No. 65] on June 25, 2007. Defendants' "Reply to Plaintiff's Response to Motion for Summary Judgment" ("Reply") [Rec. No. 72], which included objections to and a motion to strike Vicari's proffered summary judgment evidence, followed on July 16, 2007. Vicari filed a "Reply to Defendant's Objections and Motion to Strike" ("Sur–Reply") [Rec. No. 73] on July 17, 2007.

After carefully considering the record and pleadings in this cause, the Court concludes it should **SUSTAIN** Defendants' objections **IN PART** and **OVERRULE** them in part and **DENY** their motion to strike Vicari's summary judgment evidence. The Court further concludes it should **GRANT** Defendants' Motion in its entirety.

## I. BACKGROUND

This lawsuit arises from YISD and Vicari's former employment relationship. In June 2003, Vicari was an assistant principal at Ysleta High School ("YHS"), a "regular" high school with roughly 1,850 students.[1] Vicari's allegations of gender

---

1. Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 44–45.

discrimination and retaliation by YISD derive from two events: (1) a temporary reduction in Vicari's pay grade and salary following her 2003 involuntary transfer to an assistant principal position at Cesar Chavez Academy ("CCA"), an "alternative" high school; and (2) Vicari's placement on paid administrative leave in 2005. The Court sets forth the relevant facts below.

### A. Vicari's Involuntary Transfer to CCA and Subsequent Temporary Reduction in Pay Grade and Salary

On or about June 30, 2003, YISD's Associate Superintendent of Human Resources, Raye Lokey ("Lokey"), informed Vicari that YISD was involuntarily transferring her to an assistant principal position at CCA, an alternative high school with an average enrollment of approximately 120 students.[2] The transfer, which Lokey stated was to be temporary, became effective on July 22, 2003.[3]

On July 10, 2003, before the transfer's effective date, Vicari filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") challenging her reassignment.[4] After an investigation, the EEOC dismissed the Charge of Discrimination against YISD and issued Vicari a right-to-sue letter on May 19, 2004.[5] Vicari concedes she did not file a federal law suit challenging the transfer within ninety days of receiving the right-to-sue letter.[6] Accordingly, the propriety of Vicari's reassignment to CCA is not at issue in this cause.[7]

On July 28, 2003, Vicari sent a letter to Superintendent Hugo Montenegro ("Montenegro") alleging that CCA principal J.R. Guinn ("Guinn") had discriminated against her on the basis of her gender.[8] Vicari claimed that, at her first meeting with Guinn, Guinn was surprised to see her because he thought Paul Alsup ("Alsup") was going to be his assistant principal.[9]

2. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 45 and Ex. 9 (Vicari's EEOC Charge of Discrimination No. 361–2003–01419, dated July 10, 2003).

3. Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 4 (July 22, 2003 letter from R. Lokey to L. Vicari).

4. Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 9 (Vicari's EEOC Charge of Discrimination No. 361–2003–01419, dated July 10, 2003). Vicari alleged YISD had discriminated against her on the basis of her sex and an unspecified disability. Id. Vicari further asserted a female assistant principal and a female teacher had sexually harassed her. Id. Vicari additionally argued the school district had retaliated against her for reporting the alleged sexual harassment. Id.

5. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 10 (Dismissal and Notice of Rights letter dated May 19, 2004).

6. Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 84.

7. In the right-to-sue letter, the EEOC informed Vicari she could pursue a civil lawsuit against YISD based on the involuntary transfer, but must do so within ninety days of receiving the EEOC's notice of dismissal. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 10 (Dismissal and Notice of Rights letter dated May 19, 2004). In her deposition, Vicari conceded she did not file a federal lawsuit challenging her involuntary transfer within ninety days of receiving the EEOC's right-to sue letter. Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 84. Vicari's failure to timely assert her rights thus precludes any Title VII claim based on the transfer. See 42 U.S.C. § 2000e–5(f)(1) (setting forth the ninety-day period in which a plaintiff may file a civil claim in federal court after receiving a right-to-sue letter from the EEOC).

8. App. to Pl.'s Resp. to Defs.' Mot. for Summ. J. (hereafter, "Pl.'s App."), Rec. No. 67, Ex. PX–2 (July 28, 2003, letter from L. Vicari to H. Montenegro).

9. Pl.'s App., Rec. No. 67, Ex. PX–2 (July 28, 2003, letter from L. Vicari to H. Montenegro).

Vicari further alleged Guinn immediately told her she "was not suited to be an assistant principal at [CCA] because [she] was a woman."[10] Guinn reportedly stated that "rather than have a woman as assistant principal, he would have no assistant principal at all" and added that CCA students "needed male role models."[11]

Responding to Vicari's complaint, Lokey took statements from both Vicari and Guinn on July 30, 2003.[12] According to Lokey, during Vicari's interview, Vicari altered her account of Guinn's words.[13] Vicari clarified Guinn had said he thought Alsup was better suited to be Assistant Principal at CCA because Alsup could serve as a male role model to the students, while Vicari was better suited to be an assistant principal at a regular high school because of her high energy and competence at attendance management.[14] Guinn, during his interview, separately confirmed the content of his statement to Vicari.[15] After taking the statements, Lokey met with Vicari, Guinn, and Mario Gutierrez, another member of the Employee Relations staff. Lokey thereafter reported to Montenegro that, during the aforementioned meeting, "Ms. Vicari and Mr. Guinn discussed the long-range plans for Cesar Chavez Academy. They also discussed at length the comments made by Mr. Guinn. At the conclusion of the meeting, both parties were ready to return to CCA and prepare for a successful year."[16] Lokey emphasized Vicari never reasserted

---

**10.** Pl.'s App., Rec. No. 67, Ex. PX–2 (July 28, 2003, letter from L. Vicari to H. Montenegro).

**11.** Pl.'s App., Rec. No. 67, Ex. PX–2 (July 28, 2003, letter from L. Vicari to H. Montenegro). In an attachment to her letter, Vicari repeated her allegation that her transfer was in retaliation for filing an EEOC complaint:

> I. Beginning on July 22, 2002[,] I began complaining of sexual harassment, first to Associate Superintendent Gloria McNealy. On August 26, 2002, I complained of the sexual harassment to my principal, Mr. Jerry Lee. On August 26, 2002[,] I complained again to Mr. Lee. This complaint was followed by a complaint to him on April 11, 2003. On April 28, 2003[,] I lodged yet another complaint with Mr. Lee about this situation. I followed with other complaints to Mr. Lee on May 2, 2003[,] and May 29, 2003. No action was taken to stop the sexual harassment.
>
> On June 30, 2003, I met with Associate Superintendent for Human Resources, Raye Lokey, and complained again. She told me Mr. Lee was disturbed by my attire showing "too much breast" and "too much leg" and being "too tight, especially around your breasts." She also stated that Mr. Lee thought my hair was "too long and wild." Ms. Lokey told me I was going to be moved to Eastwood High School or Hanks High School as an assistant principal.
>
> II. On July 10, 2003, I filed charge number 361–2003–01419c with the Equal Employment Opportunity Commission. Notice of this charge was immediately provided [to] the Ysleta Independent School District.
>
> On July 22, 2003, Ms. Lokey notified me that I was being demoted from my level 5 assistant principal's position at Ysleta High School to a level 4 position as assistant principal at [CCA]. I was given no suitable reason for this transfer.
>
> III. I believe I was demoted on July 22, 2003[,] because I complained of sexual harassment in 2002 and 2003 and because I filed a complaint with the U.S. E.E.O.C., on July, 2003.

Pl.'s App., Rec. No. 67, Ex. PX–2 (July 28, 2003, letter from L. Vicari to H. Montenegro).

**12.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

**13.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

**14.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

**15.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

**16.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

her earlier allegation that Guinn had said Vicari was not suited to be Assistant Principal at CCA because she was a woman.[17]

At the time of Vicari's transfer, YISD classified assistant principal positions at alternative high schools at Level 307.[18] Assistant principal positions at regular high schools, in contrast, enjoyed a higher classification (Level 308) and salary.[19] Nonetheless, after her transfer from a regular high school to CCA, Vicari retained the same title, pay grade, and contract days for the 2003–2004 school year as her previous position at YHS.[20] In a letter dated July 29, 2003, apparently in response to the EEOC's investigation into Vicari's July 10, 2003, EEOC Charge of Discrimination, Lokey informed the United States Department of Labor that:

> Ms. Leslie Vicari's temporary assignment from Ysleta High School to Cesar Chavez Academy is at her current Pay Level of AP06 for 226 days. Her salary remains the same. For the school year 2003–04, her pay level will be according to recommendations made by MGT of America, Inc. The district has commissioned a district-wide compensation study.

Ms. Vicari's salary remains the same for 2003–04 and would not be reduced in the future for an involuntary reassignment. Ms. Vicari would be subject to the compensation study at any assignment in the district. It has not yet been determined what her permanent assignment is.

> Enclosed find a copy of policy DEC which contains FMLA policies.[21]

In a letter dated August 6, 2004, Superintendent Montenegro notified Vicari YISD would make her reassignment to CCA permanent, effective beginning the 2004–2005 school year.[22] Montenegro also informed Vicari YISD would continue to pay her at the same rate during the 2004–2005 school year (i.e., the rate for assistant principals at regular high schools).[23] However, for the 2005–2006 school year, YISD would adjust her salary downward to represent her actual position (i.e., the rate for an assistant principal at an alternative high school).[24] Defendants assert adjusting Vicari's compensation rate to comport with her actual position and duties as an assistant principal at an alternative high school was consistent with YISD policy.[25]

On March 23, 2005, Dennis Miller ("Miller"), YISD's Compensation Supervisor

**17.** Pl.'s App., Rec. No. 67, Ex. PX–4 (Aug. 3, 2003, letter from R. Lokey to H. Montenegro).

**18.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 5 (YISD Policy Reg. DEA–R2).

**19.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 5 (YISD Policy Reg. DEA–R2).

**20.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 11–12 & 23 and Ex. 8 (YISD Assignment Sheet/Change Form).

**21.** Pl.'s App., Rec. No. 67, Ex. PX–5 (July 29, 2003, letter from R. Lokey to G. Maglione, U.S. Dept. of Labor).

**22.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 11 (Aug. 6, 2004, letter from H. Montenegro to L. Vicari).

**23.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 11 (Aug. 6, 2004, letter from H. Montenegro to L. Vicari).

**24.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 11 (Aug. 6, 2004, letter from H. Montenegro to L. Vicari).

**25.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 4 and Ex. 12 (Excerpt, YISD Policy DEA (Local)). The policy statement to which Defendants refer states, in pertinent part:

> The Superintendent shall assign positions to pay ranges that define the minimum and maximum base pay for the positions.
> All employees shall be paid within the assigned pay ranges unless exceptions are granted by the Board.

Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 12 (Excerpt, YISD Policy DEA (Local)).

and co-defendant in this cause, issued a follow-up Memorandum to Montenegro's August 6, 2004, letter.[26] In the Memorandum, Miller reiterated YISD would adjust Vicari's pay grade and salary for the 2005–2006 school year to reflect her position as an assistant principal at an alternative high school.[27] Specifically, Miller informed Vicari her new pay grade would be Level 307, her new daily pay rate would be $282.01, and her annual salary based upon 226 days would be $67,734.26.[28] Miller issued virtually identical memoranda to three other YISD employees the same day, confirming the downward adjustments to their compensation rates in 2005–2006 to align their compensation with their actual positions at YISD.[29] Vicari did not file an internal grievance to appeal YISD's adjustment of her pay.[30] On April 20, 2005, Vicari signed a one-year term administrator contract with YISD for the 2005–2006 school year.[31] As part of that contract, which did not specify a specific salary, Vicari agreed YISD would pay her "according to the compensation plan adopted by the Board" and its "established payroll schedule."[32] YISD adjusted Vicari's pay grade and salary on or about July 1, 2005, to the levels referenced in Miller's Memorandum.[33] On December 20, 2005, via a Memorandum of the same date, Miller informed Vicari YISD would be reinstating her prior, higher pay grade and salary, effective immediately.[34] Miller explained his department had misinterpreted YISD Administrative Regulation DEA–R.[35] Mil-

**26.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 5 and Ex. 13 (Corrected Memo.).

**27.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 5 and Ex. 13 (Corrected Memo.).

**28.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 5 and Ex. 13 (Corrected Memo.). As stated in the Memorandum, Vicari's 2004–2005 pay grade had been Level 308, her daily rate $297.37, and her annual salary $67,206. *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 5 and Ex. 13 (Corrected Memo.). Martha M. Dominguez, Director of Secondary Personnel, sent Vicari a similar letter dated March 24, 2005. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 14 (Mar. 24, 2005, letter from M. Dominguez to L. Vicari). Dominguez sent a courtesy-copy of the letter to Miller, among other YISD personnel. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 14 (Mar. 24, 2005, letter from M. Dominguez to L. Vicari).

**29.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, at 5 and Ex. 15 (Mar. 23, 2005, Memo. from D. Miller to M. Quon; M. Kehrwald; & I. Bryant).

**30.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 33.

**31.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 18 (One Year Term Contract for Administrator) at ¶ 1.

**32.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 18 (One Year Term Contract for Administrator) at ¶ 5.

**33.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 21 (Salary History). Vicari subsequently received a district-wide raise which increased her daily rate to $292.65. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 36–43.

**34.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 22 (Dec. 20, 2005, Memo. from D. Miller to L. Vicari).

**35.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 22 (Dec. 20, 2005, Memo. from D. Miller to L. Vicari). Jerry Molonoski ("Molonoski"), YISD Associate Superintendent of Human Resources, testified a YISD policy adopted before January 2004 required it to maintain an employee's salary at his original pay grade when it involuntarily transferred the employee to a position carrying a lower pay grade. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 26 (J. Molonoski Depo.) at 8–9, and Ex. 25 (YISD Policy Regulation DEA–R). However, in 2004, YISD adopted the regulations of the Texas Association of School Boards ("TASB"). *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 26 (J. Molonoski Depo.) at 8–9. Pursuant to TASB regulations, an employee must be compensated at the pay grade for his

ler stated Vicari's reassignment fell under the "Demotions and Downward Reclassification" paragraph of that regulation, which required YISD to maintain her original salary.[36] Miller further stated he was enclosing a check compensating Vicari for the difference in compensation between the beginning of her 2005–2006 contract and December 20, 2005.[37] Miller sent similar memoranda to the other YISD employees who experienced downward adjustments to their pay grades and salaries as the result of involuntary transfers.[38]

## B. Vicari's Placement on Paid Administrative Leave and Second EEOC Complaint

In January 2005, Alex Del Castillo ("Del Castillo") worked at CCA as its registrar, providing technology support to the campus.[39] In a memorandum dated January 20, 2005, CCA principal Guinn asked YISD Director of Auxiliary Personnel Elizabeth Veloz ("Veloz") and Director of Employee Relations Dr. Jodi Duron ("Duron") to immediately remove Del Castillo from CCA

and reassign him elsewhere within the school district.[40] According to Guinn, although Del Castillo's previous performance had been "impressive," between the months of October and December 2004, Del Castillo's performance had deteriorated and his behavior had grown "erratic and disruptive."[41] Guinn reported Del Castillo's behavior manifested itself in various ways, including: (1) taking significant, unauthorized time from his assigned duties as registrar to assist Vicari with various tasks; and (2) aggressively giving orders to faculty and staff and conducting himself as if he were an assistant principal rather than the campus registrar.[42]

Guinn attributed Del Castillo's change in behavior and apparent sense of increased authority to Del Castillo's relationship with Vicari.[43] From information reportedly conveyed to him by a confidential source, Guinn understood every staff member at CCA perceived a romantic relationship to exist between Del Castillo and Vicari.[44] Guinn stated he believed Del Castillo's behavior resulted from Del Castillo's "potential infatuation and desire to please" Vicari.[45] According to Guinn, Del Castillo's

position. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 26 (J. Molonoski Depo.) at 8–9, and Ex. 24 (YISD Policy DEA (Local)). In Molonoski's opinion, the previous regulation did not apply to Vicari, but the district ultimately decided to resolve the arguable conflict in the favor of Vicari and other employees experiencing reductions in their pay grade due to involuntary reassignments. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 26 (J. Molonoski Depo.) at 8–9.

36. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 22 (Dec. 20, 2005, Memo. from D. Miller to L. Vicari).

37. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 22 (Dec. 20, 2005, Memo. from D. Miller to L. Vicari).

38. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 23 (Dec. 20, 2005, Memo. from D. Miller to M. Quon; M. Kehrwald; & I. Bryant).

39. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 1.

40. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 1 & 4.

41. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 1.

42. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 2.

43. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 4.

44. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 4.

45. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 4.

deteriorating performance and disruptive behavior prompted complaints from and negatively affected the performance of other CCA employees.[46] After detailing his unsuccessful attempts to resolve the situation with Del Castillo, Guinn asked Veloz and Duron to remove Del Castillo from CCA.[47]

Vicari met with Duron and Veloz on February 3, 2005.[48] During that meeting, Duron and Veloz asked Vicari if she were having an affair with Del Castillo.[49] Vicari denied having a romantic or sexual relationship with Del Castillo.[50] At Vicari's request, Duron and Veloz met with Vicari again on February 7, 2005.[51] Vicari testified she requested the February 7th meeting because she was upset Guinn had raised his complaint directly with YISD's central office staff rather than first speaking with her about the situation.[52] Duron and Veloz told Vicari that Guinn had not acted inappropriately in reporting the issue directly to Human Resources rather than discussing the matter with Vicari.[53] At the end of the February 7th meeting,

Vicari agreed to meet with Duron, Veloz, and Guinn in an effort to resolve Vicari's negative feelings regarding Guinn's decision to report his concerns directly to Human Resources.[54] That meeting occurred on February 10, 2005.[55] Vicari conceded that, at the February 10th meeting, she did not claim Guinn was excluding her from decision-making or taking away job responsibilities from her and giving them to male employees.[56]

On February 25, 2005, Vicari sent an email to Guinn regarding "Sexual Harassment Issues."[57] Vicari also forwarded the email to Duron.[58] Therein, Vicari alleged several incidents in which she had been the object of negative sexual comments by other female personnel, namely "Mrs. Burt" and "Mrs. Ellis."[59] Vicari contended she had reported these inappropriate remarks to Guinn, but Guinn had failed to respond, despite assurances to the contrary.[60] Vicari also asserted she had previously reported to Guinn that Mrs. Burt was acting and speaking inappropriately toward a male teacher, "Mr. Juarez," as

46. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) passim.

47. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 27 (Jan. 20, 2005, Memo. from J.R. Guinn to E. Veloz & J. Duron) at 1.

48. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 98.

49. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 98.

50. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 98.

51. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 99–101.

52. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 99–100.

53. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 100–01.

54. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 101.

55. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 101.

56. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 102–03.

57. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

58. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 30 (Mar. 23, 2005, email from J. Duron to L. Vicari).

59. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

60. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

well as informing Guinn regarding negative sexual comments made by "Mrs. Slack" regarding another female teacher, "Ms. Espinoza."[61] According to Vicari, Mrs. Slack's comments included accusations that Ms. Espinoza and "Mr. Gallego" were "sleeping together."[62] Vicari questioned whether Guinn had addressed these personnel issues.[63] Vicari also stated when she had asked Guinn whether she should investigate Mrs. Slack's accusation, Guinn had told her to " 'leave it alone and hope it goes away.' "[64] Vicari informed Guinn there was a perception Guinn favored personnel he had brought with him from his previous school, who included Gallego, Burt, and Ellis, and was willing to ignore allegations these individuals engaged in sexual harassment or other unprofessional behavior.[65]

On March 23, 2005, Guinn informed Vicari that, after struggling with how to respond to her message, he was forwarding her complaint to YISD's Employee Relations Department and asking it to investigate and address the issues Vicari raised in her email.[66] Duron thereafter initiated an investigation into Vicari's allegations.[67] The investigation consisted of two components. The first component consisted of a campus-wide climate survey conducted by Dr. Gary Brooks, a school-law professor at the University of Texas–El Paso.[68] The second component was a separate investigation, conducted under the Employee Relations Department's direction, into the issues raised by Vicari in her February 25th email to Guinn.[69] On June 8, 2005, "[b]ased on the serious concerns raised and addressed through the climate study, as well as the pending investigation regarding numerous allegations," YISD, "in the best interest of the District," placed both Vicari and Guinn on paid administrative leave pending the investigation's conclusion.[70] YISD Policy DFBA permits YISD to suspend a term contract

61. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

62. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

63. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

64. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

65. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 28 (Feb. 28, 2005, email from L. Vicari to J.R. Guinn).

66. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 29 (Mar. 23, 2005, email from J.R. Guinn to L. Vicari).

67. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 30 (Mar. 23, 2005, email from J. Duron to L. Vicari).

68. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 34 (Feb. 20, 2006, letter from J. Duron to YISD counsel R. Marin) at 3. The climate survey was designed to address the following specific allegations: (1) "[l]ow campus morale"; (2) "[g]ossip on campus"; (3) "[p]erceptions of favoritism"; (4) "[t]eachers/staff members in fear of retaliation"; (5) "[h]ostile/[d]iscriminatory [e]ducational [s]etting"; (6) "[n]o [d]iscipline [m]anagement"; (7) "[p]oor [b]udget [m]anagement"; (8) "[t]eachers' [n]eeds not being met"; (9) "[l]ack of [c]ommitment from Administration"; and (10) "[p]oor [l]eadership." See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 34 (Feb. 20, 2006, letter from J. Duron to YISD counsel R. Marin) at 3.

69. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 34 (Feb. 20, 2006 letter from J. Duron to YISD counsel R. Marin) at 3.

70. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 33 (June 8, 2005, letter from J. Duron to L. Vicari); Ex. 26 (J. Molonoski Depo.) at 11; Ex. 34 (Feb. 20, 2006, letter from J. Duron to YISD counsel R. Marin) at 25; Ex. 36 (June 8, 2005, letter from J. Duron to J.R. Guinn).

employee with pay or to place a term contract employee on administrative leave "during an investigation of alleged misconduct by the employee or at any time the Superintendent determines that the District's best interest will be served by the suspension or administrative leave."[71]

On June 13, 2005, Vicari filed a second Charge of Discrimination with the EEOC.[72] Therein, Vicari alleged YISD had discriminated against her on the basis of her gender (female), national origin (Anglo–American), and age (40).[73] She also alleged YISD had retaliated against her.[74] In "The Particulars" area of her EEOC Complaint, Vicari stated:

I. A. I was informed in a letter dated March 23, 2005, from Dennis Miller, Compensation Supervisor, that my pay would be reduced from $297.37 to $282.01 per day and pay grade reduced from 308 to 307.

B. I was informed by Dr. Jody Duron, Director of Employer Relations, that I would be placed on indefinite Administrative Leave on June 8, 2005.

C. I was intimidated and excluded from a decision making position by J.R. Guinn, Principal, the last time on or about June 7, 2005. My job duties and responsibilities were taken away and given to other male employees.

D. I was subjected to questioning about my personal life and questions about whether I was having an affair with an employee who works at a differ-

ent school by Dr. Jody Duron, the last time on June 6, 2005.

II. A. No reason given.

B. I was told by Dr. Jody Duron, Director of Employee Relations that it was because of an on-going investigation of certain allegations.

C. No reason given.

D. I was told by Dr. Jody Duron that my Principal had called her and told her that he was [sic] suspected that I[sic] was having an affair.

III. I believe that I was discriminated against because of my sex, female, my national origin, Anglo–American, my age, 40, and retaliated against for having complained to the School District of discrimination and for having reported sexual harassment, when my pay rare [sic] was cut, when I was placed on indefinite Administrative Leave, when I was excluded from a decision making position and had my duties taken away and given to male employees, and when I was subjected to intense questioning by Dr. Duron about my personal life and whether I was having an affair, in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act (ADEA).[75]

In a letter dated February 28, 2006, YISD Assistant Superintendent for Human Resources Molonoski notified Vicari of the investigation's result:

Based on the information previously summarized and discussed with you . . .

---

**71.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 35 (YISD Policy DFBA).

**72.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 19 (Vicari's EEOC Charge of Discrimination No. 361–2005–01770, dated July 1, 2005).

**73.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 19 (Vicari's EEOC Charge of Discrimination No. 361–2005–01770, dated July 1, 2005).

**74.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 19 (Vicari's EEOC Charge of Discrimination No. 361–2005–01770, dated July 1, 2005).

**75.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 19 (Vicari's EEOC Charge of Discrimination No. 361–2005–01770, dated July 1, 2005) (formatting in the original).

there is a preponderance of evidence that the following occurred:

1. You have failed to fulfill the duties and responsibilities in your position as Assistant Principal;

2. You have displayed unprofessional conduct in the workplace;

3. You have been insubordinate by failing to comply with official directives;

4. You have misrepresented facts to a supervisor or other District officials in the conduct of District business;

5. You have failed to communicate effectively and maintain an effective working relationship with colleagues, including members of the campus administrative team;

6. You have displayed certain conduct which is not in conformity with the accepted moral standards of the community encompassed by the District; [and]

7. You have failed to meet the District's standards of professional conduct.[76]

Molonoski further informed Vicari that, at the March 8, 2006 Board of Trustees' ("the Board") meeting, YISD Superintendent Montenegro would accordingly recommend the non-renewal of her contract.[77] The Board accepted Montenegro's recommendation and on March 8, 2006, voted to "propose non-renewal" of Vicari's term contract.[78] In simpler words, the Board voted to recommend non-renewal of the contract.

Vicari subsequently requested a hearing before the Texas Education Agency ("TEA") regarding whether YISD had good cause for not renewing her contract.[79] At the May 17, 2006, TEA hearing, Vicari resigned from her employment with YISD, effective June 30, 2006, the end of her contract term, rather than experience the formal non-renewal of her contract.[80]

Vicari and Del Castillo married on September 29, 2006.[81]

### C. Vicari's Claims

Through her "First Amended Complaint" ("Amended Complaint") [Rec. No. 2], Vicari alleges YISD engaged in unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Vicari asserts YISD unlawfully discriminated against her based on her gender when it temporarily reduced her salary and benefits after transferring her to CCA.[82] The heart of Vicari's claim is that, in similar circumstances, YISD treated Vicari, a female, differently from similarly situated male employees.[83] Vicari

76. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 37 (Feb. 28, 2006, letter from J. Molonoski to L. Vicari) at 2.

77. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 37 (Feb. 28, 2006, letter from J. Molonoski to L. Vicari) at 3.

78. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 38 (Mar. 8, 2006, letter from M. Duntley to L. Vicari) at 6.

79. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 61.

80. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 61–65; Ex. 39 (Excerpt of TEA Hear'g Tr.).

81. See Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 52–53.

82. First Am. Compl. (hereafter, "Am. Compl."), Rec. No. 2, at ¶¶ 4 & 14. As noted previously, Vicari's transfer to CCA is not at issue in this cause. See supra text accompanying note 7.

83. Pl.'s Opp. to Defs.' Mot. for Summ. J. (hereafter, "Response"), Rec. No. 65, at 8, 10–11.

also contends YISD unlawfully retaliated against her because she engaged in a protected activity (i.e., filing complaints with the EEOC).[84] Vicari argues the alleged retaliation manifested itself in her temporary pay grade and salary reduction and lost benefits.[85] Vicari further avers Miller, in his individual capacity,[86] deprived her of a property right to her salary.[87] Vicari therefore seeks to hold Miller personally liable under 42 U.S.C. § 1983 for violating her Fourteenth Amendment right to due process.[88]

### D. Defendants' Motion

Defendants counter Vicari has not set forth a prima facie case of gender discrimination or retaliation under Title VII.

#### 1. Gender Discrimination Claim

To the extent Vicari alleges gender discrimination, Defendants assert that, although there is evidence YISD temporarily reduced Vicari's pay grade and salary and suspended her without pay during an investigation, there is no evidence YISD did so due to Vicari's sex.[89] Further, YISD argues that because there is no evidence that YISD actually reduced Vicari's benefits when it temporarily reduced her pay grade and salary, there is similarly no evidence that YISD reduced Vicari's benefits based on the fact that Vicari is fe-

male.[90] Alternatively, Defendants assert that, even assuming Vicari has established a prima facie case of gender discrimination by YISD, Defendants have articulated legitimate and nondiscriminatory reasons for YISD's decisions regarding Vicari's employment.[91] Because Vicari has not carried her burden of production by presenting admissible or minimally persuasive evidence that YISD's proffered reasons were a pretext for discrimination, Defendants contend they are accordingly entitled to summary judgment in this action regarding Vicari's gender discrimination claim.[92] Related to the latter argument is Defendants' assertion that Vicari's affidavit, attached as an exhibit to her Response,[93] does not represent competent summary judgment evidence.[94]

#### 2. Retaliation Claim

Turning to Vicari's retaliation claim, Defendants argue she has likewise failed to establish a prima facie case.[95] That is, Defendants argue Vicari has produced no evidence suggesting YISD reduced Vicari's pay grade and salary (or benefits, if there was such a reduction) and suspended her without pay pending an investigation in retaliation for Vicari's February 28, 2005, sexual harassment complaint.[96] In addition, Defendants contend they have articulated legitimate, non-discriminatory rea-

**84.** Am. Compl., Rec. No. 2, at ¶¶ 4 & 15.

**85.** Am. Compl., Rec. No. 2, at ¶ 15.

**86.** Am. Compl., Rec. No. 2, at ¶¶ 3 & 4.

**87.** Am. Compl., Rec. No. 2, at ¶ 16.

**88.** Am. Compl., Rec. No. 2, at ¶ 4 & 16.

**89.** Defs.' Mot. for Summ. J., Rec. No. 46, at § II.2.

**90.** Defs.' Mot. for Summ. J., Rec. No. 46, at § II.2.

**91.** Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.3.

**92.** Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.3.

**93.** Pl.'s Resp. to Defs.' Mot. for Summ. J. (hereafter, "Pl.'s Resp."), Rec. No. 6.5, Ex. PX–1 (L. Vicari Aff.).

**94.** Defs.' Reply to Pl.'s Resp. to Mot. for Summ. J. (hereafter, "Defs.' Reply"), Rec. No. 72, at § II.B.

**95.** Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.4.

**96.** Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.4.

sons for YISD's complained-of actions.[97] Because Vicari has not come forward with sufficient evidence to show their proffered reasons are merely a pretext for unlawful retaliation, Defendants assert they are therefore also entitled to summary judgment regarding Vicari's retaliation claim.[98]

### 3. *Section 1983 Claim Against Miller*

Defendants argue Miller is entitled to summary judgment regarding Vicari's Section 1983 claim because he is immune from suit under the doctrine of qualified immunity.[99]

### 4. *Motion to Strike Vicari's Response and Exhibits and Objection to Vicari's Affidavit*

First, Defendants urge the Court to strike Vicari's Response and accompanying exhibits from the record in this cause.[100] As cause for strike, Defendants allege Vicari did not file the exhibits to her Response in accordance with Local Court Rule CV–7(d) and did not attached a proposed order to her Response, in violation of Local Court Rule CV–7(f).[101]

Second, as discussed briefly in Section I.B.I., *supra*, of this Memorandum Opinion, Defendants argue Vicari's affidavit represents incompetent summary judgment evidence.[102] Defendants assert Federal Rule of Civil Procedure 56(e) requires affidavits offered in opposition to summary judgment motions to be made on the basis of personal knowledge and assert facts which would be admissible in evidence.[103]

Here, Defendants aver the affidavit is incompetent because certain statements Vicari makes therein are: (1) not based on personal knowledge; (2) inadmissible hearsay under Federal Rule of Evidence 802; or (3) inadmissible because they are speculative or conclusory.[104]

Having summarized the Parties's arguments, the Court now considers the legal standard applicable to Defendants' Motion.

## II. *THE SUMMARY JUDGMENT STANDARD*

Federal Rule of Civil Procedure 56 ("Rule 56") governs motions for summary judgment. The purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." [105] Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [106] Under Rule 56(c) "judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

97. Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.5.

98. Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.5.

99. Defs.'s Mot. for Summ. J., Rec. No. 46, at § II.6.

100. Defs.' Reply, Rec. No. 72, at § I.A.

101. Defs.' Reply, Rec. No. 72, at § I.A.

102. Defs.' Reply, Rec. No. 72, at § I.B.

103. Defs.' Reply, Rec. No. 72, at § I.B.

104. Defs.' Reply, Rec. No. 72, at §§ I.B.I. & I.B.2.

105. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

106. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

and that the moving party is entitled to a judgment as a matter of law." [107]

The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but it need not negate the elements of the nonmovant's case.[108] Since the moving party bears the burden of proof, the Court construes the evidence in the opponent's favor and extends him the benefit of all favorable inferences.[109] When the moving party has properly supported his summary judgment motion, the non-moving party must come forward with "significant probative evidence" showing that there is an issue regarding material facts.[110] The nonmovant may not simply rely on "vague assertions that additional discovery will produce needed, but unspecified facts."[111] If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof at trial, then a grant of summary judgment is appropriate.[112] Even if the nonmovant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." [113]

### III. DEFENDANTS' MOTION TO STRIKE VICARI'S RESPONSE AND OBJECTIONS TO VICARI'S AFFIDAVIT

Before turning to the merits of Defendants' Motion, the Court must determine what evidence is properly before it. It therefore next considers Defendants' request to strike Vicari's Response and exhibits from the record and their objections to Vicari's Affidavit, as well as Vicari's Sur–Reply.

### A. Defendants' Motion to Strike Vicari's Response and Exhibits for Noncompliance with the Western District of Texas's Local Court Rules and the Court's Order Dated May 21, 2007

On May 4, 2007, Vicari filed her "Third Motion for Extension of Time to File Reply to Defendants' Motion for Summary Judgment" ("Third Motion for Extension") [Rec. No. 62]. Therein, Vicari presented

---

107. FED. R. CIV. P. 56(c); *see Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548 (noting that, under Rule 56(c), summary judgment is appropriate where it appears from the pleadings, depositions, admissions, and affidavits, that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law).

108. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1990) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

109. *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986).

110. *Ferguson v. Natl. Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir.1978).

111. *S.E.C. v. Spence & Green*, 612 F.2d 896, 901 (5th Cir.1980); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 ("Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

112. *Celotex*, 477 U.S. at 321–25, 106 S.Ct. 2548.

113. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

three certified questions which she asked YISD's corporate representative, Jerry Molonoski, during a deposition occurring on March 13, 2007. Vicari sought an order from the Court compelling the Parties to resume Molonoski's deposition and directing Molonoski to answer the certified questions. Vicari further sought a reasonable enlargement of time after Molonoski answered the certified questions in which to file a response to Defendants' Motion for Summary Judgment. In an Order [Rec. No. 64] dated May 21, 2007, the Court granted Vicari's Third Motion for Extension, giving Vicari fifteen (15) calendar days following Molonoski's continued deposition to file a response.

The Parties do not dispute that Molonoski's continued deposition took place on June 8, 2007. Per the Court's Order, Vicari therefore had fifteen calendar days to file her Response to Defendants' Motion for Summary Judgment. The fifteen day period expired on Sunday, June 24, 2007. Pursuant to Federal Rule of Civil Procedure 6(a), which governs the computation of time periods, Vicari thus had until Monday, June 25, 2007, the next business day, to file her Response in compliance with the Court's Order.[114] Further, pursuant to Local Court Rule CV–7(d), Vicari was required to include any supporting documentation (i.e., exhibits) then available with her Response.[115]

██ Here, the record shows Vicari filed her Response on June 25, 2007, but did not file the accompanying exhibits until June 26, 2007. Defendants therefore argue Vicari did not actually file a complete Response until June 26, 2007, one day past the Court's specified deadline. Vicari concedes she filed her exhibits a day late, by traditional means, but explains the Court's electronic filing system timed out before she could finish transmitting her exhibits. Under these circumstances, the Court finds Vicari has demonstrated good cause for the brief delay in filing her exhibits.[116] In addition, Defendants have not demonstrated any prejudice flowing from the slight delay in the filing of Vicari's exhibits.[117] Thus, to the extent Defendants argue the Court should strike Vicari's Response and exhibits on the basis of untimeliness, the Court will **DENY** the motion to strike.

### B. Defendants' Objections to Vicari's Affidavit

Defendants argue certain statements contained in Vicari's Affidavit dated June 25, 2007, presented as Exhibit PX–1 to Vicari's Response, represent incompetent summary judgment evidence. In the interest of providing context, the Court sets forth the substantive portion of Vicari's Affidavit in full below. The Court has italicized the specific statements to which Defendants object.

> My name is Leslie Vicari and I am the plaintiff in the above styled case. I am over the age of 18 and am capable of making this affidavit.
>
> I am certified by the Texas Education Agency to serve as an administrator in Texas school districts. On January 8, 1998[,] I became an assistant principal

---

114. *See* Fed.R.Civ.P. 6(a) (setting forth the method for computing time periods under the Federal Rules of Civil Procedure).

115. *See* LCV–7(d) (stating, in pertinent part, that "[i]f any party opposes a motion, the respondent shall file a response and supporting documents as are then available within eleven (11) days of service of the motion.").

116. *See* LCV–1 ("Any judge of this Court may waive any requirement of these rules regarding the administration of that judge's specific docket.").

117. *See id.*

with the Ysleta Independent School District. Since that time I served in the capacity of assistant principal until I was suspended from my duties on June 8, 2005[,] by Dr. Jodi Duron, Director of Employee Relations.

On July 22, 2003, I was transferred from assistant principal of Ysleta High School to assistant principal of Cesar Chavez Academy. The principal of Cesar Chavez Academy was Mr. J.R. Guinn.

*When I arrived at Cesar Chavez Academy, Mr. Guinn was not happy to see me. He said to me that he was not expecting to see a female assistant principal, that the students at Cesar Chavez Academy needed a male role model and that he would rather have no assistant principal than a female assistant principal.*

I complained about these remarks to Ms. Raye Lokey, the Associate Superintendent for Human Resources. She asked Mr. Guinn and I [sic] to do a meeting with her. *She never investigated my complaint further and took no action, not even a reprimand, against Mr. Guinn.*

My transfer from assistant principal of Ysleta High School to Cesar Chavez was involuntary. That is, I did not ask for the transfer and did not consent to it. However, my salary was not reduced. My understanding was that because my transfer was involuntary my pay would not drop or be reduced. On July 29, 2003, Ms. Lokey told the U.S. Department of Labor that my pay in the future would not be reduced because of an involuntary transfer. [Exhibit] PX–5 is a true copy of the letter from Ms. Lokey to the Department of Labor.

*On January 20, 2005, Principal Guinn sent a memorandum to Elizabeth Veloz, Director of Ancillary Personnel and to Dr. Jodi Duron, Director of Employee Relations, suggesting anonymous reports against me and complaining of my relationship with Mr. Alex Del Castillo, the registrar at Cesar Chavez Academy.*

On February 28, 2005, I filed a complaint of sexual harassment with Mr. Guinn. A true copy of this complaint is [Exhibit] PX–6. I also sent a copy to Dr. Jodi Duron. No response was made until March 23, 2005[,] when I was given notice that Mr. Guinn had referred the matter to Dr. Duron. *Dr. Duron told me the complaint would be investigated but I never received a report of this investigation or of any findings or action.* I later learned that Dr. Duron personally began an undercover investigation of my personal life by putting my house under surveillance.

Also on March 23, 2005, I was notified by Dennis Miller, Compensation Supervisor, that he was reducing my pay from $67,206 annually to $63,734.26 annually. *Such a reduction went into effect on July 1, 2005 and caused me great humiliation, hardship, and other mental anguish. I was given no due process of law, no notice or opportunity for hearing, before this reduction in pay was accomplished.*

*Since being made an assistant principal in 1998, I had always received one year term contracts that were automatically renewed 45 days before the last day of instruction.* My contract for 2004–2005 was renewed prior to April 15, 2005[,] because the Board of Trustees did not give me notice more than 45 days before the last day of instruction in April, 2005. On April 15, 2005, I was furnished a new annual contract that reflected this automatic renewal.

On June 8, 2005, I was given notice by Dr. Jodi Duron that I was being suspended with pay from my duties as assistant principal. The only reason given

was that there was an investigation of "certain allegations."

Every statement in this affidavit is true and correct.[118]

### 1. Statements One and Two

■ Defendants object to Vicari's following two statements, arguing she lacks personal knowledge: (1) "[Raye Lokey] never investigated my complaint further and took no action, not even a reprimand, against Mr. Guinn" ("Statement One"); and (2) "Since being made an assistant principal in 1998, I had always received one year term contracts that were automatically renewed 45 days before the last day of instruction" ("Statement Two"). Defendants also assert Statement One is conclusory and irrelevant. Vicari argues she did have personal knowledge of Lokey's investigation into Vicari's July 29, 2003, complaint because Lokey sent Vicari a courtesy-copy of Lokey's August 3, 2003, letter to Superintendent Montenegro.[119] In the letter, Lokey summarized Vicari's complaint and Lokey's follow-up actions, which consisted of scheduling a meeting with Vicari, Guinn, Lokey, and another Employee Relations staff member. As to Statement Two, Vicari asserts she does have personal knowledge of her contracts, as she is in the best position to know what type of contracts she received since she was made an assistant principal in 1998. After due consideration, the Court finds it should, and hereby does, **SUSTAIN** Defendants' objections to Statements One and Two. Statement One is conclusory and made in the absence of personal knowledge. As Vicari lacks personal knowledge of Lokey's actions after the meeting in question, Statement One represents an unfounded conclusion. Statement Two is simply irrelevant.

### 2. Statements Three and Four

■ Defendants object to the following statements on the grounds they represent inadmissible hearsay under Federal Rule of Evidence 802:(1) "When I arrived at Cesar Chavez Academy, Mr. Guinn was not happy to see me. He said that he was not expecting to see a female assistant principal, that the students at Cesar Chavez Academy needed a male role model and that he would rather not have an assistant principal than a female assistant principal" ("Statement Three"); and (2) "Dr. Duron told me the complaint would be investigated but I never received a report of this investigation or any findings or actions" ("Statement Four"). Defendants also argue Statement Three is irrelevant and Vicari furthermore failed to preserve the issue. Defendants additionally contend Statement Four misstates the evidence, because YISD provided Vicari with Duron's summary of the investigation. Vicari responds Statements Three and Four are not hearsay but rather admissions by a party opponent. As such, Vicari asserts both Statement Three and Statement Four are admissible under Federal Rule of Evidence 801(d)(2) because Guinn and Duron were YISD's agents or employees and made the statements within the scope of their employment.

After due consideration, the Court finds it should, and hereby does, **SUSTAIN** Defendants' objections to Statements Three and Four as irrelevant because the statements do not form the basis for any claim in this lawsuit. Vicari's present claims arise from her second EEOC Complaint filed on June 13, 2005, the substance of which the Court has set forth in Part I.B., *supra*, of this Memorandum Opinion. In particular, to the extent Vicari attempts to link Statement Three to her allegation of "intimidation" by Guinn in her second

---

118. Pl.'s App., Rec. No. 67, Ex. 1 (L. Vicari Aff. dated June 25, 2007).

119. *See* Pl.'s App., Rec. No. 67, Ex. 4 (Aug. 3, 2003, letter from R. Lokey to H. Montegro).

EEOC Complaint, the Court notes Statement Three relates to an episode which allegedly occurred almost two years before Vicari filed her 2005 EEOC Complaint. The Court finds Statement Three concerns an episode far too remote in time to form the basis of the second EEOC Complaint, which ultimately resulted in a right to sue letter from the EEOC and Vicari's instant lawsuit against Defendants in federal district court.

### 3. Statements Five, Six, and Seven

■ Defendants object to the following statements, arguing they are inadmissible due to their speculative and conclusory nature: (1) "On January 20, 2005, Principal Guinn sent a memorandum to Elizabeth Veloz, Director of Ancillary Personnel[,] and Dr. Jodi Duron, Director of Employee Relations, suggesting anonymous reports against me and complaining of my relationship with Mr. Alex Del Castillo, the registrar at Cesar Chavez Academy" ("Statement Five"); (2) "Such a reduction went into effect on July 1, 2005[,] and caused me great humiliation, hardship, and other mental anguish" ("Statement Six"); and (3) "I was given no due process of law, no notice or opportunity for hearing, before this reduction in pay

was accomplished" ("Statement Seven"). After due consideration, the Court finds it should, and hereby does, **OVERRULE** Defendants' objections to Statements Five and Six. Statement Five represents an undisputed fact, as does Statement Six, to the extent Vicari refers to the date her pay reduction became effective. The remainder of Statement Six is ultimately irrelevant.[120] As to Statement Seven, the Court **SUSTAINS** Defendants' objection, for the reasons discussed below.

■ Federal Rule of Civil Procedure 56(c) permits parties to submit affidavits in support of or opposition to a motion for summary judgment.[121] Nonetheless, the non-moving party cannot use an affidavit that is clearly a "sham" to defeat a motion for summary judgment.[122] "Although the court must resolve all factual inferences in favor of the non-movant, the non-movant cannot manufacture a disputed material fact where none exists. Thus, the non-movant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, her previous testimony."[123] However, a court should not categorically reject an affidavit offered by the non-moving party in response to a motion for summary

---

120. To the extent Vicari asserts she suffered humiliation, hardship, and mental anguish, the Court notes Vicari's subjective reaction to the temporary pay reduction is ultimately irrelevant. As analyzed in detail at Part IV.B.2 and IV.B.3, *infra*, of this Memorandum Opinion, even assuming Vicari suffered an adverse employment action, she cannot otherwise establish a prima facie case of gender discrimination. Vicari also cannot show the legitimate, non-discriminatory reason for its actions YISD has offered are pretextual.

121. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

122. *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980).

123. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir.1984) (internal citation omitted); *see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143

L.Ed.2d 966 (1999) (collecting cases in which, "with virtual unanimity," the circuit courts have held that a party cannot create a genuine issue of material fact sufficient to summary judgment by simply later submitting an affidavit that contradicts the party's earlier sworn deposition); *Copeland v. Wasserstein, Perella & Co. Inc.*, 278 F.3d 472, 482 (5th Cir.2002) ("[U]nder the federal rules, when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required explanation of that conflict. This jurisprudential rule has evolved from cases in which opposing parties had provided the affidavit and the deposition, but it applies equally to situations such as this, when the affidavit contradicts prior sworn testimony by the affiant himself.").

judgment where the offered affidavit contains merely minor discrepancies.[124]

The Court has carefully compared the contested statements in Vicari's Affidavit with her earlier deposition testimony. After such review, the Court finds Statement Seven in Vicari's Affidavit sufficiently contradicts her deposition testimony, without explanation, to warrant striking the statement from the summary judgment record as unreliable.[125] The Court accordingly **STRIKES** Affidavit Statement Seven from the record in this cause.

Having ruled on Defendants' motion to strike Vicari's Response and exhibits, as well as their objections to Vicari's affidavit, the Court now considers the merits of Defendants' Motion.

## IV. *VICARI'S GENDER DISCRIMINATION CLAIM*

### A. *Title VII's Prohibition Against Discrimination in Employment*

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private employment.[126] In a case such as this, where the plaintiff presents no or inadequate direct evidence of discriminatory intent,[127] she may rely on circumstantial evidence to support her claim.[128]

A court reviews Title VII discrimination claims based on circumstantial evidence pursuant to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Co. v. Green.*[129] Under that rubric, the plaintiff must first establish a prima facie case of discrimination prohibited by Title VII.[130] To establish a prima facie case of intentional discrimination under a disparate treatment theory such as Vicari advances, a plaintiff must show: (1) she belongs to a protected class; (2) she was qualified for the position in question; (3) she was subject to discharge or other adverse employment action; and (4) her employer treated other similarly situated employees outside the plaintiff's

124. *Kennett–Murray Corp.*, 622 F.2d at 894.

125. Vicari testified at her October 23, 2006, deposition that she did in fact receive advance notice of her pay reduction. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 20, 27–28.

126. 42 U.S.C. § 2000e *et seq.*

127. In this context, "direct evidence" is "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.2002) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir.1995)). In Vicari's Response, she implicitly concedes she lacks direct evidence of discrimination, discussing her opposition to Defendants' Motion in terms of the *McDonnell Douglas* framework described below. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J., Rec. No. 65, at 7–12. Further, after reviewing the evidence Vicari has submitted in opposition to summary judgment, the Court finds none of it represents direct evidence of a discriminatory animus by YISD.

128. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir.2001); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

129. *McDonnell v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004); *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001).

130. *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512. In the Title VII context, a "prima facie case" denotes what is required to establish a legally mandatory, rebuttable presumption rather than referring to the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

protected class more favorably.[131] In the context of Title VII's core anti-discrimination provision, section 703(a), "adverse employment actions" include only employer actions which affect an employee's compensation, terms, conditions, or privileges of employment.[132] In addition, "similarly situated" employees are employees who are treated more favorably in "nearly identical" circumstances.[133] As its phrasing "nearly identical" suggests, the Fifth Circuit narrowly construes the "similarly situated" requirement.[134]

■ The plaintiff's burden at this juncture is merely one of production rather than persuasion.[135] A reviewing court must therefore not engage in a credibility assessment regarding the plaintiff's proffered evidence at this stage.[136] Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer, who must articulate some legitimate, non-discriminatory reason for his actions regarding the plaintiff's employment.[137] The burden on the employer at this stage is similarly one of production

**131.** *Bryan,* 375 F.3d at 360; *Okoye,* 245 F.3d at 512.

**132.** *See Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2409, 2412–13, 165 L.Ed.2d 345 (2006) (explaining that, unlike Title VII's anti-retaliation provision, Title VII's substantive anti-discrimination provision is limited to employer actions affecting the terms and conditions of employment); *see also McCoy v. City of Shreveport,* 492 F.3d 551, 559–60 (5th Cir.2007) (noting the difference in the adverse employment analysis, depending upon whether the court conducts the inquiry in the context of a substantive Title VII claim as opposed to a retaliation claim).

**133.** *Wheeler v. BL Dev. Corp.,* 415 F.3d 399, 406 (5th Cir.2005); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir.1995).

**134.** *See Wheeler,* 415 F.3d at 406 (finding insufficiently identical circumstances where the terminated white plaintiff and a black manager who remained employed had the same supervisor, were both company directors, and were both accused of removing company assets at relatively the same time; the Court of Appeals noted that the white plaintiff lied repeatedly during the course of the company's investigation, while the black employee admitted her actions; in addition, the value of the property the black employee removed was "dramatically less" than the property the white plaintiff removed); *Mayberry,* 55 F.3d at 1090 (finding the plaintiff had not shown "nearly identical" circumstances merely because he produced evidence that white and black employees in the same position had scrapped parts due to the employee's operator error or poor workmanship, but were not disciplined; the plaintiff had not

shown the undisciplined employees had, like him, a history of poor work performance and scrapped parts damage amounting to $8,000); *Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir.1991) (concluding that the plaintiff had not shown "nearly identical" circumstances because the employee outside plaintiff's protected class who allegedly received more favorable treatment did not have the same supervisor); *Smith v. Wal–Mart Stores (No. 471),* 891 F.2d 1177, 1180 (5th Cir.1990) (determining the plaintiff and the employee outside her protected class who allegedly received preferential treatment were not similarly situated where the employer discharged the plaintiff because the plaintiff violated its non-fraternization policy and the other employee's conduct did not involve the employer's non-fraternization policy). "[P]ut another way, the conduct [or circumstances] at issue is not nearly identical when the difference between the plaintiff's conduct [or circumstances] and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer."; *Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304–05 (5th Cir.2000) (finding the "striking differences" between the plaintiff's and purportedly similarly situated employee outside the plaintiff's protected class "more than account[ed] for the different treatment they received.").

**135.** *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

**136.** *Id.*

**137.** *Bryan,* 375 F.3d at 360.

rather than persuasion.[138]

■ Significantly, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for discharge.[139] "We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue."[140] Moreover, "the existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."[141]

■ Once the employer provides sufficient evidence to show it predicated the employee's discharge or other adverse employment action on a legitimate, nondiscriminatory reason, the burden of production moves to the plaintiff.[142]

> This burden now merges with the burden of persuading the [fact finder, by a preponderance of the evidence,] that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.[143]

Thus, assuming the plaintiff has established a prima facie case of unlawful gender discrimination, to survive a motion for summary judgment, the plaintiff must present circumstantial evidence sufficient to create a material fact issue regarding whether the employer's proffered nondiscriminatory reasons were not its true reasons, but rather a pretext for discrimination on the basis of factors prohibited by Title VII.[144]

### B. Whether Vicari Has Established a Prima Facie Case of Title VII Discrimination Under a Disparate Treatment Theory of Liability

Defendants contend Vicari has not established a prima facie case of disparate treatment discrimination under Title VII because Vicari has not shown she suffered an adverse employment action or YISD treated other similarly situated individuals outside her protected class more favorably. Because both elements are necessary to establish a prima facie case of disparate treatment discrimination under Title VII, Defendants argue Vicari's gender discrimination claim fails as a matter of law. Alternatively, Defendants assert they have come forward with a legitimate, non-discriminatory reason for reducing Vicari's pay grade and salary and for placing her on paid administrative leave pending the outcome of YISD's investigations into allegations of her misconduct. The Court considers the merits of Defendants' arguments below.

138. *Russell,* 235 F.3d at 222.

139. *Little,* 924 F.2d at 97.

140. *Id.*

141. *Id.*

142. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Bryan,* 375 F.3d at 360.

143. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

144. *Id.* at 254–55, 101 S.Ct. 1089; *see also* FED. R. CIV. P. 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (explaining that, even if the nonmovant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

### 1. Vicari Has Satisfied the "Adverse Employment Action" Element of a Prima Facie Disparate Treatment Discrimination Claim Under Title VII.

The Court first considers whether Vicari has shown she was subject to an adverse employment action. The actions at issue are YISD's: (1) temporary reduction of Vicari's compensation following her transfer to CCA; and (2) placement of Vicari on paid administrative leave.

■ The Court turns first to Vicari's argument that she suffered an adverse employment action when YISD reduced her pay, albeit temporarily. For substantive Title VII claims, actions affecting compensation represent an ultimate employment decision, and thus an adverse employment action.[145] YISD's reduction in Vicari's compensation would therefore clearly be an adverse employment action but for the fact that the reduction was ultimately temporary and YISD reimbursed Vicari in full for the period of time in which she received a reduced salary.[146] As there appears to have been no ultimate harm to Vicari, it is unclear whether the temporary reduction in her pay can truly rise to the level of an adverse employment action for purposes of establishing a prima facie case of employment discrimination. The parties offer no authority to either support or undermine the contention that a merely temporary and fully reimbursed reduction in compensation removes such a reduction from the realm of adverse employment actions, nor is the Court aware of any such authority. In an abundance of caution, the Court will assume for purposes of argument that a temporary and later fully reimbursed reduction in compensation may constitute an adverse employment action in a claim alleging gender discrimination under Title VII.

■ The Court now considers Vicari's claim that YISD's decision to place her on paid administrative leave represents an adverse employment action for purposes of establishing a prima facie case of substantive Title VII discrimination. Applicable circuit precedent holds that, in the context of a substantive Title VII claim, placing an employee on paid administrative leave pending investigation does not constitute an adverse employment action when no negative consequences accrue to the employee.[147] Here, taken alone, YISD's decision to place Vicari on paid administrative leave could not qualify as an adverse employment action if the district had subsequently reinstated Vicari after completing

---

145. *See McCoy v. Shreveport*, 492 F.3d 551, 559 (5th Cir.2007) (stating that, in the context of substantive Title VII claims, adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating).

146. There is no evidence Vicari suffered any loss of benefits as the result of the temporary reduction in her pay grade and salary.

147. *See McCoy*, 492 F.3d at 559 (noting that, under the standard for substantive Title VII claims, the district court properly held that the defendant's placing the plaintiff on paid administrative leave was not an adverse employment action when the plaintiff voluntarily resigned); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir.2000) (citing *Pierce v. Texas Dept. of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir.1994), for the proposition that investigations are not adverse employment actions for purposes of a substantive Title VII claim and finding no adverse employment action where defendant placed plaintiff on paid administrative leave pending investigation and subsequently reinstated the plaintiff to his prior position), *cf. Pierce*, 37 F.3d at 1150 (concluding, in the context of a 42 U.S.C. § 1983 claim, the plaintiff had failed to establish that placing her under investigation was an adverse employment action when the action resulted in no adverse consequences to her).

its investigation. However, after completing its investigation into Vicari's conduct, YISD officials recommended that the Board not renew Vicari's term contract. The Board in fact adopted the district's recommendation. The Court concludes recommending non-renewal of Vicari's contract sufficiently qualifies as an adverse employment action, although Vicari subsequently resigned her employment at the TEA hearing.

In sum, the Court determines Vicari has sufficiently established she suffered an adverse employment action, insofar as YISD: (1) temporarily reduced her pay grade and salary; and (2) placed her on paid administrative leave and subsequently recommended non-renewal of her contract. The Court next considers whether Vicari has established that YISD treated other similarly situated individuals outside her protected class more favorably.

**2. However, Vicari Has Not Satisfied the "Similarly Situated" Element of a Prima Facie Disparate Treatment Discrimination Claim Under Title VII.**

 To establish a prima facie case of disparate treatment discrimination under Title VII, Vicari must also produce evidence that YISD afforded similarly situated individuals better treatment. The circumstances of the allegedly similarly situated individuals must be "nearly identical." [148] The similarly situated individuals who received better treatment must also fall outside Vicari's protected class.[149] To satisfy the "similarly situated" element of a prima facie disparate treatment discrimination claim, it is not suffi-

cient for Vicari to direct the Court to evidence that certain of her fellow employees received better treatment than she did. Rather, Vicari must come forward with evidence regarding employees in "nearly identical circumstances" to those described above to allow a meaningful comparison.[150] Then, Vicari must demonstrate those employees received preferential treatment from YISD.[151] For the reasons discussed below, the Court finds Vicari has failed to carry her burden of production in this respect.[152]

 Regarding the temporary reduction in her pay grade and salary, Vicari has presented no evidence YISD treated her less favorably than it treated any other employee it involuntarily transferred. In fact, the only evidence the summary judgment record reveals is that YISD treated Vicari exactly the same as the other three employees it involuntarily transferred during the period in question. As for her suspension with pay pending the outcome of the district's investigation into her alleged misconduct, Vicari has similarly failed to carry her burden. First, the Court notes the district suspended Guinn, a male employee whom Vicari accused of misconduct, the very same day, under the same conditions imposed on Vicari. Further, to the extent Vicari alleges the district allowed male employees to engage in romantic relationships with subordinate employees without interference, the Court finds Vicari has come forward with no examples of "similarly situated" employees, her summary judgment evidence notwithstanding.

**148.** *Wheeler,* 415 F.3d at 406; *Mayberry,* 55 F.3d at 1090.

**149.** *Wheeler,* 415 F.3d at 399; *Bryan,* 375 F.3d at 360; *Okoye,* 245 F.3d at 512–13.

**150.** *Wheeler,* 415 F.3d at 399; *Bryan,* 375 F.3d at 360; *Okoye,* 245 F.3d at 512–13.

**151.** *Bryan,* 375 F.3d at 360; *Okoye,* 245 F.3d at 512–13.

**152.** *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097.

In her Response, Vicari presents the deposition testimony of Thomas Miller, Superintendent Montenegro's Chief of Staff.[153] Miller acknowledged he is engaged in a romantic relationship with Martha Dominguez, Director of Secondary Personnel for YISD's Employee Relations department.[154] Miller testified Superintendent Montenegro and members of the Board are aware of his relationship with Dominguez.[155] Miller also testified that neither Montenegro nor anyone on the school board has objected to or investigated the relationship.[156]

The Court finds Vicari is attempting to compare apples and oranges. Miller is Chief of Staff for the superintendent of the school district. The summary judgment evidence shows Miller is engaged in a relationship with a member of the Employee Relations office. There is no evidence Dominguez is in Miller's line of supervision, nor is there any evidence school district officials have received complaints regarding the relationship. Further, there is no evidence Miller and Dominguez have ever been less than forthcoming about the existence of a romantic relationship between them.

Vicari, on the other hand, was an assistant principal at an alternative high school within the school district. YISD officials received information that Vicari was participating in a undisclosed romantic relationship with a subordinate employee on her own campus. Further, YISD received a complaint that the alleged relationship between Vicari and Del Valle was negatively affecting other employees at CCA. In the course of investigating the complaint, YISD officials uncovered information which led them to believe, correctly or incorrectly, Vicari had lied about the existence of the romantic relationship. The investigation's results additionally suggested Vicari's performance was deficient in other areas as well. Because Vicari has not shown YISD treated Guinn more favorably than it treated her after receiving a complaint alleging misconduct or Thomas Miller and Vicari were similarly situated, the Court concludes Vicari has not established the final element required to set forth a prima facie case of disparate treatment discrimination under Title VII. The Court will therefore GRANT Defendants' Motion inasmuch as Defendants assert Vicari fails to set forth a prima facie Title VII claim.

## 3. In Addition, Vicari Cannot Show YISD's Actions Regarding Her Employment Were a Pretext for Unlawful Discrimination.

 Even if the Court were to conclude Vicari had sufficiently stated a prima facie claim of gender discrimination prohibited by Title VII, YISD has nonetheless come forward with a legitimate, non-discriminatory reason for reducing Vicari's pay and for placing her on paid administrative leave pending the outcome of the district's investigation into her alleged misconduct. Regarding the temporary reduction of Vicari's pay grade and salary, YISD has presented evidence it temporarily reduced Vicari's pay because of the manner in which it interpreted a school district regulation. YISD notes it applied its interpretation of the regulation in question to all school district employees who were subject to an involuntary transfer to positions carrying a lower pay grade and salary. Upon reinterpreting the regulation, the district reinstated Vicari's original pay

---

**153.** *See* Pl.'s App., Rec. No. 67, Ex. PX–7 (T. Miller Depo.).

**154.** *See* Pl.'s App., Rec. No. 67, Ex. PX–7 (T. Miller Depo.) at 10, 12–18.

**155.** *See* Pl.'s App., Rec. No. 67, Ex. PX–7 (T. Miller Depo.) at 17.

**156.** *See* Pl.'s App., Rec. No. 67, Ex. PX–7 (T. Miller Depo.) at 17.

grade and salary, as well as the pay grade and salary of all other affected employees, and fully reimbursed them for any difference in compensation they experienced.

As to placing Vicari on paid administrative leave, the district has produced evidence it received a complaint regarding Vicari's relationship with Del Valle, Vicari's subordinate employee. In the course of investigating the complaint, district officials obtained information which led them to conclude that Vicari was in fact engaged in a romantic relationship with Del Valle, lied about her involvement in the relationship to school district officials, and retaliated against YISD employees who cooperated in the district's investigation. In addition, during the course of the district's investigation, evidence emerged calling Vicari's general performance and effective leadership into question. YISD contends it was on the basis of this evidence, and not due to Vivari's gender, that it placed Vicari on paid administrative leave and ultimately recommended the Board not renew her term contract. Vicari must now present circumstantial evidence sufficient to create a material fact issue regarding whether YISD's proffered nondiscriminatory reasons were not its true reasons, but rather a pretext for discrimination on the basis of factors prohibited by Title VII.[157] To survive Defendants' Motion for summary judgment, Vicari's evidence in this regard must be sufficient to allow a reasonable jury to return a verdict in her favor.[158] Merely colorable or not significantly probative evidence will not suffice.[159] After examining Vicari's evidence, the Court finds it falls far short of this mark. Therefore, even if Vicari could set forth a prima facie case of gender discrimination, the Court finds YISD would still be entitled to summary judgment in its favor regarding Vicari's substantive Title VII claim.

## VII. *VICARI'S RETALIATION CLAIM*

### A. *Legal Standard for Retaliation Claims*

As well as prohibiting employment discrimination, Title VII proscribes retaliation against an employee because she opposes an unlawful employment practice. The *McDonnell Douglas* burden-shifting scheme which applies to Title VII disparate treatment claims also applies to claims an employer retaliated against an employee for engaging in activities protected by Title VII.[160]

Thus, under *McDonnell Douglas*'s framework, once a plaintiff establishes a prima facie case of unlawful retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.[161] If the defendant introduces evidence which, if true, would permit the fact finder to conclude the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question: whether

---

157. *Id.* at 254–55, 101 S.Ct. 1089; *see also* FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (explaining that, even if the nonmovant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

158. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

159. *Id.*

160. *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983).

161. *Long,* 88 F.3d at 304; *McMillan,* 710 F.2d at 1116.

the defendant unlawfully retaliated against the plaintiff.[162] In other words, the plaintiff must " 'adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation.' "[163]

To establish a prima facie case of retaliation, the plaintiff must demonstrate: (1) she engaged in an activity protected by Title VII; (2) she was subject to an adverse employment action; and (3) there is a causal link between the plaintiff's participation on the protected activity and the adverse employment action—that, but for the protected activity, the plaintiff would not have been subjected to the adverse employment action of which she complains.[164] Here, in contrast to Title VII's substantive anti-discrimination provision, "actionable retaliation is not limited to so-called 'ultimate employment actions' " such as hiring, granting leave, discharging, promoting, and compensating.[165] None-

theless, Title VII's anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."[166] Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[167] It is not Title VII's purpose to "set forth a general civility code for the American workplace."[168] Rather, Title VII's anti-retaliation provisions seek to prevent an employer from interfering with an employee's unfettered access to the legislation's remedial mechanisms.[169] "It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."[170]

---

**162.** *Long,* 88 F.3d at 304; *McMillan,* 710 F.2d at 1116. As the *Long* Court explained, the ultimate issue in an unlawful retaliation case (*i.e.,* whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII) initially seems identical to the third element of the plaintiff's prima facie case (*i.e.,* whether a *causal* link exists between the adverse employment action and the protected activity). 88 F.3d at 305 n. 4. However, the ultimate issue and the third element of the plaintiff's prima facie case carry distinct burdens of proof. *Id.*

The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a "but for" cause of the adverse employment decision. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct.

The standard for establishing the "causal link" element of the plaintiff's prima facie case is much less stringent.... A plaintiff need not prove that her protected activity was

the sole factor motivating the employer's challenged decision in order to establish the "causal link" element of a prima facie case. *Id.* (internal citations and quotations omitted).

**163.** *Rios v. Rossotti,* 252 F.3d 375, 380 (5th Cir.2001) (quoting *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998)).

**164.** *Mato v. Baldauf,* 267 F.3d 444, 450 (5th Cir.2001); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1092 (5th Cir.1995); *Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984).

**165.** *Burlington Northern & Santa Fe Ry.,* 126 S.Ct. at 2411.

**166.** *Id.* at 2414–15.

**167.** *Id.* at 2415 (internal quotations omitted).

**168.** *Id.* at 2415 (internal quotations omitted).

**169.** *Id.* at 2415.

**170.** *Id.* at 2415.

■ While the Court must evaluate the materiality of an alleged retaliatory action from the standpoint of a reasonable employee, using an objective standard, it must bear in mind that the significance of any given act of retaliation will often depend on the particular circumstances.[171] In short, "context matters."[172] Finally, the standard discussed above does not require a reviewing court or jury to consider the nature of the discrimination which led to the filing of retaliation charges.[173] "The standard is tied to the challenged retaliatory act, not the conduct that forms the basis of the Title VII complaint."[174]

### B. Whether Vicari Has Established a Prima Facie Case of Unlawful Retaliation

#### 1. The Parties' Arguments

As previously stated, to establish a prima facie case of retaliation, the plaintiff must demonstrate: (1) she engaged in a protected activity; (2) she was subject to an adverse employment action; and (3) there is a causal link between the plaintiff's participation in the protected activity and the adverse employment action.[175] Here, Defendants argue Vicari has failed to establish the "causal-link" aspect of a prima facie retaliation claim. They note Vicari filed her first EEOC complaint on February 28, 2005. To the extent Vicari attempts to Hnk the February 28, 2005, EEOC complaint and her subsequent salary reduction, Defendants assert YISD decided and informed Vicari of the impending salary reduction in August 2004, well before Vicari filed her first EEOC action. Moreover, YISD took the same action regarding three other employees who were subject to an involuntary transfer. Thus, Defendant contends Vicari has failed to show that, but for her February 28, 2005, EEOC complaint, YISD would not have temporarily reduced her pay grade and salary. To the extent Vicari argues her placement on administrative leave on June 8, 2005, was in retaliation for filing her February 28, 2005, EEOC complaint, Defendants emphasize YISD took exactly the same action against Guinn, a male employee whom Vicari accused of misconduct. Insofar as Vicari relies on any other alleged action or omission by YISD or its employees, Defendants argue such events are too remote to establish causality. In response, Vicari urges the Court to reject Defendants' arguments.

#### 2. Discussion

■ After considering the Parties' arguments and summary judgment evidence, and drawing all inferences in Vicari's favor, the Court concludes Vicari has failed to set forth a prima facie case of retaliation because she has not established causation. Further, even assuming for purposes of argument Vicari could set forth a prima facie case of discrimination, the Court finds Defendants have come forward with legitimate, non-discriminatory reasons for the actions regarding Vicari's employment. Because Vicari has not produced minimally persuasive evidence that Defendants' proffered reasons for its actions are pretextual, the Court finds a reasonable jury could not return a finding in Vicari's favor regarding her retaliation claim. The Court accordingly finds Defendants are entitled to summary judgment regarding Vicari's retaliation claim as well.

171. *Id.* at 2415.

172. *Id.* at 2415.

173. *Id.* at 2415.

174. *Id.* at 2416.

175. *Mato,* 267 F.3d at 450.

## VIII. *VICARI'S SECTION 1983 CLAIM AGAINST DEFENDANT MILLER*

### A. *The Parties' Arguments*

Vicari sues Defendant Miller under 42 U.S.C. § 1983, alleging Miller violated her Fourteenth Amendment by taking Vicari's "property right to her salary under color of law and without due process of law." [176] The following represents the entirety of Vicari's factual allegations against Miller in support of her § 1983 claim:

> Plaintiff had a contract with Defendant School District for the 2005–2006 school year that called for at least the same salary she had earned in 2004–2005. On March 23, 2005, Plaintiff was notified by Mr. Dennis Miller, Compensation Supervisor, that her annual salary was being reduced by $3,472.01. In addition, the annual district wide pay raise of 3.43%, effective July 1, 2005, was also denied Plaintiff. Plaintiff was provided lower benefits.[177] This demotion was in violation of Plaintiff's contract and policy of the Board of Trustees which required that Plaintiff's 2004–2005 salary be maintained. No notice or due process of law was given Plaintiff before her salary was taken. Defendant, Dennis Miller, was operating under color of law at the time he took Plaintiff's salary and acted with evil malice or

with reckless or callous indifference to Plaintiff's constitutionally protected property interest in her employment.[178]

Defendants respond Miller is entitled to the defense of qualified immunity because it is undisputed he did not participate in the decision to reduce Vicari's pay grade and salary and had no discretion or decision making authority whatsoever regarding the reduction of Vicari's compensation. Instead, Defendants assert the undisputed evidence shows Miller was merely acting on the directive of Superintendent Montenegro, as evidence by Montenegro's August 2004 letter to Vicari.[179] Further, Defendants assert there is no evidence Miller's conduct violated Vicari's constitutional rights or was objectively unreasonable in light of clearly established law. Defendant also emphasizes the burden of negating Miller's qualified immunity defense rests with Vicari and asserts Vicari has failed to carry her burden in this regard.

Vicari argues Miller is not entitled to a qualified immunity defense for the following reasons. According to Vicari, pursuant to Texas Education Code § 21.206(b), if a school board fails to give notice of nonrenewal of a teacher's term contract within forty-five days of the last day of instruction, the lack of notice constitutes an election to employ the teacher in the same professional capacity for the following school year.[180] Because the district

---

**176.** Pl.'s Am. Compl., Rec. No. 2, at ¶¶ 10 & 16.

**177.** This allegation directly contradicts Vicari's deposition testimony. In her deposition, Vicari testified YISD adjusted her pay grade and salary on or about July 1, 2005, to the levels referenced in Miller's March 23, 2005, Memorandum. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 21 (Salary History). Vicari testified she subsequently received a district-wide raise which increased her daily rate to $292.65. *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 36–43.

**178.** Pl.'s Am. Compl., Rec. No. 2, at ¶ 10.

**179.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 11 (Aug. 6, 2004, letter from H. Montenegro to L. Vicari).

**180.** Texas Education Code § 21.206 reads as follows:

> § 21.206. Notice of Contract Renewal or Nonrenewal
> (a) Not later than the 45th day before the last day of instruction in a school year, the board of trustees shall notify in writing each teacher whose contract is about to

allegedly did not give her such notice, Vicari argues she therefore had a contract for (and property right in) a specific salary and job as an administrator for the 2005–2006 school year. Further, Vicari argues YISD policy DEA–R prohibited the district from reducing an involuntarily-transferred employee's salary. Vicari contends Raye Lokey knew policy DEA–R prohibited the reduction, as evidenced by Lokey's July 29, 2003, letter to the United States Department of Labor.[181] Vicari argues Miller also knew or should have known policy DEA–R prohibited the reduction, but nevertheless reduced Vicari's salary and took her property interest without affording her due process. In addition, Vicari asserts Miller should have known he could not deprive Vicari of her alleged property without first affording her due process of law and to do so violated Vicari's clearly established constitutional property rights. Further, to the extent Defendants assert a ministerial exception to liability under § 1983, Vicari argues that, if any such exception exists, it is extremely narrow and inapplicable here. Further, Vicari states Defendants have

failed to offer evidence demonstrating Miller's duties were only ministerial.

Defendants reply there is no evidence Miller was a decision-maker, and in fact, the undisputed evidence shows Miller did not have authority to bind the District and did not participate in the decision to reduce Vicari's salary. Further, Defendants contend Texas Education Code §§ 22.0511 and 22.0514 prohibit Vicari from bringing a claim against Miller in Miller's individual capacity for actions taken in the course and scope of his employment. Defendants aver Vicari has failed to prove a violation of a clearly established constitutional right because, under Texas Education Code § 21.204(e), an administrator does not have a property interest in a contract beyond the contract's term.[182] Defendants moreover note Vicari's contract did not specify a salary amount. In addition, they assert Vicari repeatedly received notice of the reduction beginning in August 2004. Despite the notice, Vicari did not avail herself of the district's internal grievance system regarding the pay reduction. Defendants state filing an internal grievance would have entitled Vicari to a response

---

expire whether the board proposes to renew or not renew the contract.
(b) The board's failure to give the notice required by Subsection (a) within the time specified constitutes an election to employ the teacher in the same professional capacity for the following year.
(c) This section does not apply to a term contract with a superintendent.
Tex. Educ.Code § 21.206 (Vernon's 2007). A "teacher" includes principals. Tex. Educ.Code § 21.201(1).

181. *See* Pl.'s App., Rec. No. 67, Ex. PX–5 (July 29, 2003, letter from R. Lokey to G. Maglione, U.S. Dept. of Labor).

182. Texas Education Code § 21.204 states:
§ 21.204. Term Contract
(a) A term contract must be in writing and must include the terms of employment prescribed by this subchapter.

(b) The board of trustees may include in the contract other provisions that are consistent with this subchapter.
(c) Each contract under this subchapter is subject to approval by the board of trustees.
(d) The board of trustees shall provide each teacher with a copy of the teacher's contract with the school district and, on the teacher's request, a copy of the board's employment policies. If the district has an Internet website, the district shall place the board's employment policies on that website. At each school in the district, the board shall make a copy of the board's employment policies available for inspection at a reasonable time on request.
(e) A teacher does not have a property interest in a contract beyond its term.
Tex. Educ.Code § 21.204.

and provided for an internal appeal process should she be dissatisfied with the response. Thus, Defendants contend Vicari waived her right to any due process to which she may have been entitled.

Having summarized the Parties' arguments, the Court now considers the defense of qualified immunity.

### B. Qualified Immunity

█ Public officials performing discretionary functions are generally shielded from suit unless a plaintiff shows by specific allegations that the officials violated clearly established statutory or constitutional rights of which reasonable individuals would be aware.[183] When a defendant claims he is entitled to qualified immunity, a court must conduct the following two-pronged inquiry: "First, the court must determine whether the plaintiff has alleged a violation of a clearly established federal constitutional or statutory right. Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established legal rules at the time of the alleged violation."[184] "If

no constitutional right has been violated, the inquiry ends and the defendants are entitled to qualified immunity."[185]

█ Qualified immunity is designed to avoid the "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service."[186] This limited form of immunity applies only to claims seeking "to impose individual liability upon a government officer for actions taken under color of state law."[187] Thus, if successfully established, the defense of qualified immunity requires a court to dismiss the plaintiff's pertinent claims against the defendant-official in his individual capacity.[188]

█ Significantly, "[w]hen a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."[189] Because the defense is intended to give government officials a right to avoid standing trial and avoid the burdens of pretrial matters, adjudication of qualified immunity claims should occur "at the earliest possible stage

**183.** *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Schultea v. Wood,* 47 F.3d 1427, 1431 (5th Cir.1995) (noting the *Harlow* Court specifically rejected the subjective, good faith element of the qualified immunity defense which it had adopted seven years earlier in *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)); *Lion Boulos v. Wilson,* 834 F.2d 504, 507 (5th Cir.1987) (citing the *Harlow* standard and noting a defendant who is entitled to claim qualified immunity is shielded not only from liability but also from the costs of

trial and the burdens of far-reaching discovery).

**184.** *Beltran v. City of El Paso,* 367 F.3d 299, 303 (5th Cir.2004) (citations omitted).

**185.** *Linbrugger v. Abercia,* 363 F.3d 537, 540 (5th Cir.2004).

**186.** *Lion Boulos,* 834 F.2d at 507 (quoting *Harlow,* 457 U.S. at 816, 102 S.Ct. 2727).

**187.** *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (differentiating official-capacity suits from personal-capacity suits and explaining officials sued in their personal capacities may assert personal immunity defenses such as objectively reasonable reliance on existing law).

**188.** *Id.*

**189.** *McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir.2002).

in litigation."[190] However, "the legally relevant factors bearing upon the *Harlow* question will be different on summary judgment than on an earlier motion to dismiss."[191] At the earlier stage, "it is the defendant's conduct as alleged in the complaint" that the Court scrutinizes for "objective legal reasonableness."[192] At the summary judgment stage, in contrast, the plaintiff can no longer rest on the pleadings.[193] Rather, the court looks to the evidence before it, examining it in the light most favorable to the plaintiff when conducting the *Harlow* inquiry at the summary judgment stage.[194] The Fifth Circuit has recognized that "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' "[195]

## C. Discussion

■■■ The Court first considers the Parties' dispute over the nature of Miller's conduct and its ultimate relevance to his qualified immunity defense.[196]

The exception to qualified immunity for functions that are "ministerial" rather than "discretionary" is quite narrow. For qualified immunity purposes a duty is "ministerial" only where the statute or regulation [in question] leaves no room for discretion—that is, it "specifies the precise action that the official must take in each instance."[197]

Moreover, "the ministerial-duty exception applies only where it is a violation of the ministerial duty that gives rise to the cause of action for damages."[198] Here, Vicari does not claim Miller is liable because he violated a YISD regulation; rather she seeks damages based on Miller's purported taking of her salary without due process, in violation of the Fourteenth Amendment.[199] Thus, the issue before the Court is whether Miller violated any clear-

---

190. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

191. *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

192. *Id.*

193. *Id.*

194. *Id.*

195. *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir.1994) (quoting *Hunter*, 502 U.S. at 229, 112 S.Ct. 534).

196. The Court cannot help but note the irony of the Parties' arguments. Defendants, who clearly wish for the Court to find Miller entitled to qualified immunity, argue Miller's actions were ministerial. If the Court were to find Miller acted in a purely ministerial capacity, however, Defendants's argument regarding Miller's entitlement to qualified immunity would arguably fail under the *Harlow* standard. *See id.* Vicari, for her part, attempts to rebut Defendants' argument by citing cases which stand for the proposition that the definition of a "ministerial act," for purposes of the *Harlow* analysis, is so narrow as to be virtually non-existent. Thus, by Vicari's own logic, Miller's actions must have been

discretionary, a conclusion supporting Defendants' claim that Miller is entitled to qualified immunity. Be that as it may, as the Court discusses, *infra*, the categorization of an official's action as "ministerial" and "discretionary" has become largely irrelevant in the opinion of several circuit courts of appeals, including the Fifth Circuit.

197. *Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir.1994) (quoting *Davis v. Scherer*, 468 U.S. 183, 196 n. 14, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)); *see also Eddy v. Virgin Islands Water & Power Authority*, 256 F.3d 204, 210–11 (3d Cir.2001) (Alito, J.) (noting the extreme breadth of the term "discretionary" and the narrow definition of "ministerial" within the qualified immunity context).

198. *Id.*

199. *See id.* (finding the plaintiffs' argument, that the defendant-officers were not entitled to qualified immunity because the officers violated a ministerial duty by not following a department regulation, irrelevant because the plaintiffs did not claim a right to damages based on the violation of the regulation, but rather on the theory that the officers violated the plaintiffs' rights under the Fifth and Fourteenth Amendments).

ly established constitutional right rather than whether he violated a YISD policy.[200] Further, the Eighth Circuit Court of Appeals has concluded "the ministerial-duty exception to the qualified immunity defense is dead letter" law:

> First, we have been unable to find any post-[*Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984),] cases in which a court has denied qualified immunity because the official was performing a ministerial task. Furthermore, in light of the limitations placed on the exception by *Davis*, we are unable to imagine the case in which the ministerial-duty exception ever could ap-

ply. Other circuits also have expressed skeptical views of the distinction between discretionary and ministerial duties.[201]

Indeed, it appears the First, Fifth, and Seventh Circuits have, like the Eighth Circuit, challenged the ministerial-discretionary distinction's relevance in the qualified immunity context.[202] In addition, the Second Circuit has concluded a subordinate employee is entitled to qualified immunity when the subordinate performs a solely ministerial task by carrying out an order which is: (1) not facially invalid, and (2) issued by a superior employee who is himself entitled to qualified immunity.[203] With

**200.** *See id.* (stating the issue before the court was whether the defendant-officers' conduct violated any clearly established constitutional rights and not whether they may have violated departmental regulations).

**201.** *See id.* (citing relevant cases).

**202.** *See Horta v. Sullivan*, 4 F.3d 2, 12 (1st Cir.1993) (questioning the continuing relevancy of the ministerial-discretionary duty issue and concluding that in this case, "insofar as the concept of discretionary function is relevant at all in the immunity sphere, [the defendant] was engaged in a discretionary function."); *Gagne v. City of Galveston*, 805 F.2d 558, 560 (5th Cir.1986) ("Although the Supreme Court's qualified-immunity opinions have given special attention to the need to avoid inhibiting the ardor of public officials whose positions entail the exercise of discretionary authority, the Court has never implied that the immunity defense is lost when an official is engaged in routine tasks. Indeed, any such suggestion was firmly rejected in footnote 14 of *Davis v. Scherer*, where the Court emphasized that the so-called 'ministerial duty' exception to qualified immunity is extremely narrow in scope."); *Coleman v. Frantz*, 754 F.2d 719, 727–28 (7th Cir.1985) ("Plaintiff appears to argue that the basis for the public officials' qualified immunity is the common law ministerial-discretionary distinction. But there is no evidence provided by the plaintiff or discovered by us indicating that the ministerial-discretionary distinction is the common law foundation for Section 1983 immunity. Further, the Supreme Court

has cast doubt upon the relevance of this common law doctrine to Section 1983 immunity considerations and upon the wisdom of utilizing the distinction as a basis for determining the existence of an immunity from Section 1983 liability ... This Court also considers that as a matter of public policy, it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of a particular official act challenged. Not only would such an analysis require repeated judicial applications of the unclear ministerial-discretionary distinction, but more importantly it would do little to forward the purposes of the immunity ... The use of a ministerial-discretionary distinction by courts would provide these officials with little or no guidance as to the protection afforded them."). The Second Circuit has observed the continuing validity of the distinction is questionable, but found it unnecessary to decide the issue. *See Varrone v. Bilotti*, 123 F.3d 75, 82 (2d Cir.1997) (noting the challenges to the ministerial-discretionary distinction's continuing validity but declining to rule on the issue because, even if the defendants in questions performed a merely ministerial function, they were still entitled to qualified immunity).

**203.** *Varrone*, 123 F.3d at 82 ("Realistically, those two [subordinate] officers [who conducted the strip search] had no choice but to carry out the order that they received, which was facially valid. It would be anomalous to provide qualified immunity to the higher

these principles in mind and to the extent it is necessary for the Court to determine whether Miller's actions were "discretionary" or merely "ministerial," after examining the relevant summary judgment evidence, the Court concludes Miller's actions were discretionary as a matter of law. The district regulations in question do not sufficiently specify the precise action that officials such as Miller must take in each instance to make actions taken pursuant to those regulations "ministerial," as the Supreme Court has narrowly defined the term.[204] In sum, the Court concludes Miller is eligible to raise the defense of qualified immunity with regard to Vicari's § 1983 claim against him.

It now remains for the Court to conduct its *Harlow* inquiry, Vicari alleges Miller deprived her of her right to procedural due process protected by the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment's due process clause "protects citizens from acts of government that 'deprive any person of life, liberty or property, without due pro-

cess of law.'"[205] "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*."[206] In *Mathews v. Eldrige*, the Supreme Court identified three factors courts should weigh in deciding how much process a property interest deserves:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.[207]

"The 'minimal' process set out by [Fifth Circuit] cases applying *Eldridge* is notice of the reasons for a proposed deprivation and some opportunity to respond to the

ranking officers who ordered the strip search, but to deny it to the subordinates who carried out the order. Those two subordinate officers are entitled to qualified immunity for conducting the strip search of [the plaintiff] pursuant to the facially lawful order of their superior officer, even if making the search involved the performance of a ministerial function.") (internal citations omitted); *see also Williamson v. City of Virginia Beach*, 786 F.Supp. 1238, 1260–61 n. 28 (E.D.Va.1992) (explaining that, by eliminating the ministerial-discretionary distinction, courts remedy "the perverse notion that high ranking officials with discretionary and policy-making powers (and likely access to counsel) are immune from suit when similar immunity is unavailable to lowly functionaries who have little, if any choice in carrying out their ministerial functions."). This rationale for extending qualified immunity seems particularly appropriate here. The undisputed summary judgment evidence in this cause shows the decision to reduce Vicari's pay grade originated with Superintendent Montenegro and the

Board. The undisputed evidence additionally shows Miller did not participate in the decision to reduce Vicari's pay. Indeed, Miller's only actions in connection with Vicari seem to have been: (1) writing a follow up letter to Montenegro's August 2004 letter informing Vicari of the impending reduction in her pay grade; and (2) informing Vicari by letter that the district would be reinstating her original pay grade.

**204.** *See Davis v. Scherer*, 468 U.S. 183, 196 n. 14, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**205.** *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir.2005) (quoting the language of the Fourteenth Amendment).

**206.** *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (emphasis in original).

**207.** *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

substance of the allegations before a final deprivation occurs." [208]

▮▮▮▮ In sum, to establish a Fourteenth Amendment right to due process, a plaintiff must demonstrate: (1) a state actor (2) deprived (3) a person (4) of a constitutionally protected liberty interest.[209] "It is well settled that before it may pass on a procedural due process claim, a federal court must first determine whether the interest alleged to have been infringed amounts to 'life, liberty, or property' under the [F]ourteenth [A]mendment." [210] Accordingly, as a threshold inquiry, the Court must determine whether the Fourteenth Amendment protects the property interest of which Miller allegedly deprived Vicari.[211]

"Whether a property interest exists must be determined by reference to state law." [212] Here, Vicari alleges a constitutionally protected property right arose under Texas Education Code § 21.206(b).[213] As the Court has previously summarized, Vicari alleges that, during the 2004–2005

school year, the district did not notify her within forty-five days of the last day of instruction it would not renew her term contract for the 2005–2006 school year. Vicari therefore theorizes she had a contract for a specific salary and administrator position for the 2005–2006 school year.

The Court concludes Vicari's argument lacks merit. Section 21.206(b) only states the board of trustees must notify the teacher within the forty-five day time period whether it intends to renew the contract.[214] However, "the statute does not mandate that the Board specify the terms of the contract within that same time period." [215] Further, the undisputed summary judgment evidence in this case shows the district notified Vicari well in advance—as early as August 6, 2004—that it had made her transfer to CCA permanent and would reduce her pay grade and salary according to YISD regulations then in effect.[216] Vicari subsequently signed a term employment contract for 2005–2006 which did not specify a particular salary but rather stat-

**208.** *Williams v. Texas Tech Univ. Health Sciences Ctr.*, 6 F.3d 290, 293 (5th Cir.1993).

**209.** *See Texas Faculty Ass'n v. Univ. of Texas*, 946 F.2d 379, 383 (5th Cir.1991) ("Though the nature of due process varies according to the governmental and private interests involved, whenever the four elements necessary to trigger that guarantee occur—that is, whenever (1) a state actor (2) deprives (3) a person (4) of a protected interest—*some* sort of procedural protection must be provided.") (emphasis in original); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) ("To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs must show they have asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law.") (internal quotations omitted).

**210.** *Burris v. Willis Indep. Sch. Dist., Inc.*, 713 F.2d 1087, 1090 (5th Cir.1983).

**211.** *See id.*

**212.** *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 252 (5th Cir.1984) (citing *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)).

**213.** *See supra* text accompany note 178.

**214.** *See* TEX. EDU.CODE § 21.206(b) and *supra* text accompanying note 178; *see also Gutierrez v. Laredo Indep. Sch. Dist.*, 139 S.W.3d 363, 368 (Tex. App–San Antonio 2004, no pet.).

**215.** *Gutierrez*, 139 S.W.3d at 368.

**216.** Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 11 (Aug. 6, 2004, letter from H. Montenegro to L. Vicari); *see supra* text accompanying note 34.

ed she would be paid "according to the compensation plan adopted by the Board" and its "established payroll schedule."[217] Given these circumstances, the Court concludes Vicari did not have a constitutionally-protected property interest in a salary for the 2005–2006 school year which was identical to her salary for the 2004–2005 school year.

Alternatively, even assuming Vicari had a constitutionally-protected property right in a salary which was at least equal to the salary she received for the 2004–2005 school year, there is no evidence Miller or the school district deprived Vicari of this interest without due process. Defendants have presented undisputed evidence demonstrating the district has an internal procedure for addressing employee grievances regarding compensation.[218] Vicari has not alleged the district's grievance procedure is constitutionally inadequate.[219] Further, Vicari concedes she did not avail herself of the district's grievance procedure.[220] For these reasons, the Court concludes Vicari has failed to establish either the existence of a constitutionally-protected property right or a deprivation of the process due her. Accordingly, the Court also concludes Miller is entitled to qualified immunity regarding Vicari's § 1983 claim against him.

## IX. *CONCLUSION AND ORDERS*

For the reasons discussed above, the Court finds it should overrule Defendants' Objections in part and sustain them in part, as set forth in Part III, *supra*, of this Memorandum Opinion and Order. The Court further concludes it should grant Defendants' Motion in its entirety. The Court accordingly enters the following orders:

1. Defendants' "Motion for Summary Judgment" [Rec. No. 46] is hereby **GRANTED.**

2. The Court accordingly **DISMISSES** Plaintiff Leslie Vicari's Amended Complaint [Rec. No. 2] **WITH PREJUDICE.**

3. All pending motions in this cause, if any, are **DENIED AS MOOT.**

**SO ORDERED.**

**217.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 18 (One Year Term Contract for Administrator) at ¶¶ 1 & 5.

**218.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 187 (DGBA (Local)—"Personnel–Management Relations: Employee Complaints/Grievances").

**219.** *See Williams v. Texas Tech Health Sci. Ctr.,* 6 F.3d 290, 293 (5th Cir.1993).

**220.** *See* Defs.' Mot. for Summ. J., Rec. No. 46, Ex. 3 (L. Vicari Depo.) at 33.